IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Michael F., by and through his Parents, | : | |
| Kevin F. and Kelly F., | : | |
| of Drexel Hill, Pa., 19026 | : | |
| | : | Civil Action |
| Plaintiffs | : | |
| v. | : | No. |
| | : | |
| UPPER DARBY | : | |
| SCHOOL DISTRICT | : | |
| 4611 Bond Ave, | : | |
| Drexel Hill, Pa., 19026 | : | |
| | : | |
| Defendant. | : | |

## **COMPLAINT**

### I.   **Introduction**

1.     This action is brought by Michael F., a minor child with disabilities, and his parents, Kevin F. and Kelly F. (collectively referred to as "Plaintiffs" or the "Family"), against Defendant Upper Darby School District (the "District") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, and its federal and state implementing regulations; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and its federal and state implementing regulations; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, and its federal and state implementing-regulations; and Chapters 14 and 15 of the Pennsylvania Code.

2.     After fully considering the entire record and the failures of the District to provide Michael with a Free Appropriate Public Education ("FAPE") in multiple ways, this Court should determine that the Defendant violated the foregoing statutes, reverse the Hearing Officer's decision, and award appropriate relief to the Family, specifically tuition reimbursement for Michael's 2019-2020, 2020-2021, and 2021-2022 school years at Benchmark Academy ("Benchmark"),

reasonable attorneys' fees and costs, and any other relief this Court deems just.

II.   **Procedural History**

3.      Michael resides within the District, but attended kindergarten and first grade at Saint Dorothy Roman Catholic School ("St. Dorothy's"), where he struggled to learn to read.

4.      During Michael's first grade year, Parents requested that the District evaluate Michael to determine if he is a student with a disability in need of special education services.

5.      The District evaluated Michael; its December 20, 2018 Evaluation Report found Michael eligible for special education services as a student with Specific Learning Disabilities due to severe discrepancies between his intellectual ability and his academic achievement in several areas of reading and written expression.

6.      After receiving the Evaluation Report, the Family participated in an Individualized Education Program ("IEP") meeting with the District on January 15, 2019 to discuss the special education and related services the District would offer in an in-District program.

7.      The Family correctly concluded that the District's IEP did not meet Michael's needs; accordingly, they enrolled Michael at Benchmark, a private school specifically designed to support students with average intelligence and learning differences or executive functioning difficulties.

8.      Michael attended Benchmark for the 2019-2020 and 2020-2021 school years (second and third grade) and he is currently enrolled there for the 2021-2022 school year (fourth grade).

9.      In October 2020, during Michael's third grade year, Parents contacted the District's school psychologist about Michael receiving his education in the District.

10.      The District's school psychologist wrongly advised Parents that they would need to withdraw Michael from the private school and enroll him in the District; she also incorrectly

stated that he would have to start attending school in the District with the previously-issued (and inappropriate) January 2019 IEP *before* the District would reevaluate or update the IEP.

11.     Parents again contacted the school psychologist, this time via e-mail, and the psychologist again confirmed that the District required the Family to first withdraw Michael and for him to begin in-District with the January 2019 IEP in place before it would reevaluate or offer a revised IEP for Michael. This advice and the District's policy violate IDEA, Section 504 and the ADA as a matter of law.

12.     In violation of these federal laws, the District did not propose to reevaluate Michael, gather updated information, or propose an updated IEP even though the January 2019 IEP expired in January 2020.

13.     The Parents correctly concluded that withdrawing Michael from Benchmark and having him receive the education offered in the outdated January 2019 IEP would not meet his needs.

14.     On June 22, 2021, the Family filed a Special Education Due Process complaint against the District for tuition reimbursement for the 2019-2020, 2020-2021, and 2021-2022 school years, an equitable remedy available under IDEA and Section 504.

15.     Following an evidentiary hearing, held over two dates, June 28, 2021 and August 18, 2021, administrative Hearing Officer Cheryl Cutrona ("Hearing Officer" or "Ms. Cutrona")[1] issued a written decision on October 1, 2021, denying the Family relief.

16.     The Family now appeals to this Court and respectfully requests the Court reverse Ms. Cutrona's erroneous decision and award appropriate relief to the Family.

---

[1] Special Education Hearing Officers in Pennsylvania are not Administrative Law Judges and are not referred to as "Your Honor," and instead are addressed as "Hearing Officer" or by their surname.

### III.   Parties

17.     Michael was born in 2011, and, at all times relevant to this action, resided within the geographical boundaries of the Defendant School District. Michael is a student with disabilities as defined under IDEA, and a Protected Handicapped Student under Section 504 and the ADA.

18.      Kevin F. and Kelly F. are Michael's parents. At all times relevant to this action, Michael has resided with his parents within the geographical boundaries of the Defendant School District.

19.     The District is located at 4611 Bond Ave, Drexel Hill, Pennsylvania. The District is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries. Such services include those mandated under IDEA and Section 504. *See* 22 Pa. Code Chapters 14 and 15; *see also* 24 P.S. Chapter 13.

### IV.   Jurisdiction and Venue

20.     This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA, Section 504, and the ADA.

21.     Plaintiffs have exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a Special Education Due Process hearing. *See* 20 U.S.C. § 1415(i)(2)(A).

22.     The Family's claims and remedies are authorized by 20 U.S.C. § 1415; 29 U.S.C. § 794(a); and 28 U.S.C. §§ 2201 and 2202. These statutes provide for declaratory relief and any further relief that this Court deems necessary and proper.

23.     All of the Defendant's actions have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District

pursuant to 28 U.S.C. § 1391.

**V.     Standard of Review**

1.     This Court is required to undertake a fully independent review of the record and the Hearing Officer's decision. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982). This review is far broader and more searching than a district court's review of other administrative matters. In this regard, "[j]udicial review in IDEA cases differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Susan N. v. Wilson School District*, 70 F.3d 751, 757 (3d Cir. 1995).

24.     In conducting this independent review, district courts: (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(B).

25.     However, the modified de novo review stems from an interpretation of the IDEA and does not apply to Section 504 and ADA claims. *K.N. v. Glouster City Bd. Of Edu.*, 379 F.Supp.3d 334, 344 (2019). Thus, a federal district court applies a de novo standard of review for the Section 504 and ADA claims, as opposed to the modified de novo standard of review that the Court will apply for the IDEA claims. *Id.* (*citing T.F. v. Fox Chapel Area Sch. Dist.*, 589 F.App'x 594, 598 (3d Cir. 2014)).

**VI.     Applicable Law**

**A.     IDEA requires that a school district identify all children with disabilities who live in the district through a special education evaluation.**

26.     The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related

services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

27.     After a child is determined to be eligible, the IDEA statute and regulations provide for periodic reevaluations, which "may occur not more than once a year unless the parent and public agency agree otherwise; and must occur at least once every three years, unless the parent and the public agency agree that an evaluation is unnecessary." 20 U.S.C. § 1414(a)(2)(B)(i), (ii); *see also* 34 C.F.R. §300.303(b).

28.     School districts, however, also have the obligation to "ensure that a reevaluation of each child with a disability is conducted" at any time "the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or if the child's parent or teacher requests a reevaluation." 20 U.S.C. §1414(a)(2)(A)(i), (ii); *see also* 34 C.F.R. 300.303(a).

29.     According to IDEA, school districts must, at a minimum, evaluate students with disabilities at least every three years, commonly known as a "triennial evaluation." 34 C.F.R. § 300.303(b)(2).

30.     Indeed, a school district has an obligation to reevaluate <u>all</u> children residing in the District known to be eligible under the IDEA and to develop an IEP when a parent either: (1) enrolls their eligible child in their district of residence after a period of absence; or (2) requests that the District evaluate and/or offer the family a proposed IEP. *L.T. v. North Penn School Dist.*, 2018 WL 6600206 (E.D. Pa. 2018); *see also Shane T. v. Carbondale Area Sch. Dist.*, 2017 WL 4314555 (M.D. Pa.  2017); *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F.Supp.2d 1057 (D.N.J. 2011) (*citing* 34 C.F.R.  300.536 (1999)). This obligation extends, without exception to students enrolled in private schools. *Shane T.*, *supra*, 2017 WL at 4314555 *9; *see also I.H. v. Cumberland*

*Valley School Dist.*, 842 F. Supp.2d 762, 772-73 (E.D. Pa. 2012).

> **B.**    **An appropriate evaluation must comprehensively evaluate a child in all suspected areas of need.**

31.    The public agency must ensure that a student's "evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304.

32.    More specifically, the requirements for an appropriate evaluation are set out in the IDEA and its implementing regulations (*see* 34 C.F.R. §§ 300.301-300.310) and require, among other things, that an evaluation, including reevaluations, include a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student, including information from the parents, and assess the child in all areas of suspected disability. 34 C.F.R. § 300.304. Moreover, an evaluation must be sufficient in its scope to identify the educational needs of a student, including present educational levels and related developmental needs, and assist in determining what supports and modifications to the student's program are necessary. 34 C.F.R. §§ 300.304, 300.305.

> **C.**    **After the school district identifies a student's needs in an Evaluation Report, the IEP Team must use the report to create an IEP and offer a student a Free Appropriate Public Education.**

33.    At the beginning of each school year, a school district is required to develop an IEP for <u>every</u> child with a disability who resides within its jurisdiction. 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a).

34.    Because a school district's obligation to offer FAPE derives from the child's residency in the community, even disabled students in private schools must be offered an IEP, and enrollment is not required to trigger the mandatory obligation to provide an offer of FAPE. *Shane*

*T.*, *supra*, 2017 WL at 4314555 *9; *see also I.H.*, *supra*, 842 F. Supp.2d at 772-73 ("requiring enrollment as a prerequisite to obtaining an IEP . . . would be at odds with the 'remedial nature' of the IDEA") (*citing Forest Grove School Dist. v. T.A.*, 557 U.S. 230 (2009)).

35.    Every resident child eligible for special education services is entitled to an offer of FAPE, and especially so upon parent's request. *L.T.*, 2018 WL 6600206 at *7. If a resident child is attending a parentally-placed, privately-funded program, the child still has an absolute right to an offer of a FAPE via a thorough evaluation and a proposed IEP. *Shane T.*, 2017 WL 4314555 at *9.

36.    The IDEA provides that an IEP team, which includes both school officials and the child's parents, must develop an appropriate educational program and placement for each eligible child through an IEP. A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the district complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefit.  *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982); *see also Endrew F. v. Douglas County School District RE-1*, ___U.S. ___, 137 S. Ct. 988, 999 (2017).

37.    The IDEA requires that every IEP include a statement of the child's present levels of academic achievement and functional performance; a statement of measurable annual goals; a description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on the progress the child is making toward meeting the annual goals will be made; a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child; a statement of the program modifications or supports for school personnel that

will be provided to enable the child to advance appropriately toward attaining the annual goals, to be involved in and make progress in the general education curriculum; and an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in activities. 20 U.S.C. §1414(d); 34 C.F.R. § 300.320.

38.     The United States Supreme Court in its decision in *Endrew F.*, *supra*, emphasized that IDEA requires more than a program reasonably calculated to allow a student to make "*some progress.*" *Endrew F.*, 137 S. Ct. at 997, 1000-01 (emphasis added). Instead, IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

39.     In addition, an "educational program must be appropriately ambitious in light of his circumstances," as minimal "progress from year to year can hardly be said to have been offered an education at all. The goals may differ, but every child should have the chance to meet challenging objectives." *Id.* at 999-1000.

40.     The progress standard set forth in *Endrew F.* is therefore consistent with, and expands upon, the standard that has been applied for many years in this Circuit, requiring that a student must receive a program that is reasonably calculated to allow a student to make *meaningful* educational progress and achieve "significant learning." *Brandywine Heights Area School Dist. v. B.M.*, 248 F. Supp.3d 618, 632 (E.D. Pa. 2017) (*citing Endrew F.*; *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006)).

41.     It is well-settled that "education" extends beyond discrete academic skill, and includes the social, emotional, behavioral, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. *M.C.*, 81 F.3d at 393-94; *see also Polk*, *supra*, 853 F.2d at 181-182; *Kruelle v. New Castle County*

*School Dist.*, 642 F.2d 687, 693 (3d Cir. 1981); *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010); *G.D. v. Wissahickon Sch. Dist.*, 832 F.Supp.2d 455, 467 (E.D. Pa. 2011) (Finding a FAPE violation based on the failure to develop a positive behavior support plan for a student despite his above average cognitive abilities and academic progress).

42.     The appropriateness of an IEP is determined *as written*. *Susan N.*, 70 F.3d at 762 ("The measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date.") (internal quotations omitted).

        **D.**     **A school district is required to reimburse a parent private school tuition where the district failed to offer an appropriate IEP and where the private school placement was appropriate.**

43.     The Supreme Court has established that when a school district's IEP is inappropriate, and the parents obtain and pay for an appropriate private school program, the school district must fund the private program provided by the child's parents. *Florence County School Dist. v. Carter*, 510 U.S. 7, 14, 114 S.Ct. 361 (1993); *School Comm. of Burlington v. Dept. of Educ. of Massachusetts*, 471 U.S. 359, 370-71, 105 S.Ct. 1996 (1985); 34 C.F.R. § 300.148(c).

44.     As such, under IDEA, parents who disagree with their child's program and placement at a school district may unilaterally enroll their child in an appropriate out-of-district placement and obtain tuition reimbursement where a court determines that the school district has not offered an appropriate education for the child. *Shore Reg'l High School Bd. of Educ. v. P.S.*, 381 F.3d 194, 198-99 (3d Cir. 2004).

45.     Under the test for tuition reimbursement from *Burlington*, *supra*, a court's first step is to determine whether the school district offered the student FAPE through an appropriate IEP. *Burlington*, 471 U.S. at 369-70

46.     After determining whether the school district offered FAPE, the court must

determine whether the private school was appropriate. *Id*.

47.    The private school does not need to offer a least restrictive environment, nor is it held to the same FAPE standards as the school district. *Florence County*, *supra*, 510 U.S. at 13-14; *see also Warren G. ex rel. Tom G. v.Cumberland County School Dist.*, 190 F.3d 80, 83-84 (3d Cir. 1999).

48.    Once a court determines a placement is appropriate, the court may reduce the tuition reimbursement only if the court finds that an equitable reduction is necessary after examining (1) whether the parents informed the school district of their intent to remove the student, (2) whether the parents made their child unavailable for a reevaluation, or (3) whether the parents otherwise acted unreasonably. 34 C.F.R. § 300.148(d).

**E.     A student may also bring a tuition reimbursement claim under Section 504.**

49.    Under Section 504, recipients of federal funds such as the District are required to "provide a free appropriate public education [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

50.    Similar to IDEA, Section 504 and its regulations require the identification of all children with disabilities and the provision of appropriate educational services. 29 U.S.C.§ 794; *see also* 34 C.F.R. § 104.1 *et seq.*

51.    Section 504 requires that "a public elementary or secondary education program

shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. § 104.32; *see also Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 253 (3d Cir. 1999); *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir 1995), *abrogated on other grounds*, *A.W. v. Jersey City Public Schools*, 486 F. 3d 791 (3d Cir. 2007).

52.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA.  However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

2.     A school may violate Section 504 independent of any violations of IDEA. *See Lauren G. v. West Chester Area School Dist.*, 906 F.Supp.2d 375 (E.D.Pa. 2012) (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period for which no relief was granted under IDEA). The eligibility standards under Section 504 for children with disabilities are broader than the narrower, categorized disabilities recognized by IDEA "and thus, some students covered by Section 504 are not covered under the IDEA." *Batchelor v. Rose Tree Media School Dist.*, 759 F.3d 266, 269 n.4 (3d Cir. 2014) (*compare* 20 U.S.C. § 1401(3) *with* 42 U.S.C. § 12102(1) (incorporated by reference in 29 U.S.C. § 705(9)(B))).

53.     Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. *James S. v. School Dist. of Phila.*, 559 F. Supp.2d 600, 620 (E.D. Pa. 2008).

54.     To establish a violation of Section 504, a plaintiff must prove that: (1) he is

"disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at the school. *Ridgewood*, 172 F.3d at 253.

55.     Tuition reimbursement is clearly an available remedy under Section 504, just as under IDEA. *Molly L.*, 194 F.Supp.2d at 429 n.7 ("Tuition reimbursement has been awarded in cases arising under both the Rehabilitation Act and IDEA."); *see also Kevin M. v. Bristol Twp. School Dist.*, 2002 WL 73233 at *5 (E.D.Pa. Jan. 16, 2002) (because there are "few differences, if any," between requirements of IDEA and Section 504, "[t]he Court . . . finds that plaintiff may pursue his tuition reimbursement claim against Bristol Township pursuant to Section 504 as well as IDEA."); *Borough of Palmyra., Bd. Of Educ. v. F.C.*, 2 F.Supp.2d 637, 641-42 (D.N.J. 1998) (rejecting argument that tuition reimbursement is not available form of relief under Section 504); *Christen G. v. Lower Merion School Dist.*, 919 F. Supp. 793, 816, 821 (E.D.Pa. 1996) (reimbursement for costs of private school education was appropriate relief under both the IDEA and Section 504).

## F.     Where a school district violates IDEA and Section 504, it also violates the ADA.

56.     The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996). As with IDEA and Section 504, the ADA requires districts to offer all students FAPE

without a showing of intent or bad faith as any denial of FAPE violates these federal laws. *Id.* While many damage claims (not at issue here) require a different level of culpability, the ADA's causation standard is lower than Section 504, and does not require the disability to be the "sole cause" of the discrimination or denial of benefits, rather "the ADA only requires 'but-for' causation," i.e. but for the disability, there would be no discrimination or denial of benefits. *Furgess v. Pa. Dep't. Of Corr.*, 933 F.3d 285 (3d Cir. 2019).

> **G.** **A parent is entitled to attorney's fees and costs if the parent is the prevailing party.**

57.     The IDEA, Section 504, and the ADA all permit the recovery of reasonable attorneys' fees and costs by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415; 42 U.S.C. § 12205; 34 C.F.R. § 300.517; 29 U.S.C. § 794a; *Andrew M. v. Delaware County Office of Mental Health/Mental Retardation*, 2005 WL 783070 at *15 (E.D. Pa. 2005) (attorneys' fees are recoverable under Section 504); *Daniel S. v. Scranton School Dist.*, 230 F.3d 90, 95 (3d Cir. 2000) (attorneys' fees are recoverable under IDEA); *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311 (3d Cir. 2006) (attorneys' fees are recoverable under the ADA). The recovery of costs under Section 504 and the ADA is more extensive than under IDEA, as expert witness costs and related expenses are recoverable under Section 504 and the ADA. *I.H. v. Cumberland Valley Sch. Dist.*, 842 F.Supp.2d 762, 777 (M.D. Pa. 2012); *M.M. v. Sch. Dist. of Philadelphia*, 142 F.Supp.3d 396, 413 (E.D. Pa. 2015).

## VII.    Factual History

58.     Plaintiffs incorporate by reference the preceding paragraphs.

59.     Michael is a ten-year-old fourth grade student with disabilities that impair, *inter alia*, his ability to read, write, and complete academic work and assignments.

60.     Michael attended kindergarten and first grade at a private parochial school, St.

Dorothy's.

61.     At St. Dorothy's, Michael was one of approximately 20 students in his regular education classroom. He struggled with basic sight words, could not retain the letters of the alphabet, could not complete his classwork, had difficulty retaining information previously taught, and would come home without the materials needed for homework.

62.     Due to Michael's academic difficulties, St. Dorothy's removed Michael from the general education classroom for sessions with a reading specialist three times a week, which included a one one-to-one session and two small group sessions, but Michael did not show progress.

63.      Parents hired a private tutor specializing in the Wilson Reading System—an intensive reading intervention for students with language-based learning differences—to work with Michael twice a week after school from late fall of his kindergarten year through first grade.

64.     In October 2018, due to Michael's continued struggles in first grade despite the in-school and out-of-school supports, Parents requested that the District evaluate him for special education.

65.     The District evaluated Michael and determined that he is eligible for special education services as a student with Specific Learning Disabilities with needs relating to his phonological processing, letter discrimination, decoding, spelling, sight word vocabulary, and self-monitoring.

66.     The District's December 20, 2018 Evaluation Report found that Michael has average intelligence, but his reading skills lag significantly behind, in the lower limits of the below-average range.

67.     Specifically, the District's evaluation found that Michael has severe discrepancies between his intellectual ability and his academic achievement in the areas of basic reading, reading

fluency, reading comprehension, and spelling.

68.     Furthermore, the District identified executive functioning weaknesses, which re-flected difficulties in classroom initiating, planning and monitoring output; holding information in memory over time; and organizing belongings.

69.     As part of the evaluation process, the District's school psychologist observed Michael at St. Dorothy's. She noted that Michael required one-to-one support from his teacher during an independent writing assignment and, even with significant one-to-one support, Michael was still unable to complete his assignment. Additionally, she observed that Michael was distracted and turned in an incomplete assignment to avoid being the last student to finish.

70.     Michael's first grade teacher from St. Dorothy's recommended that Michael would benefit from a small classroom setting and more direct instruction.

71.     Incredibly, the 2018 Evaluation Report did not assess Michael's writing abilities other than spelling even though the District's school psychologist observed his inability to inde-pendently complete a writing assignment during class.

72.     The Evaluation Report also did not fully assess Michael's reading fluency: the school psychologist did not administer the silent reading fluency and word recognition fluency subtests because she did not think he would be able to successfully complete them.

73.     The 2018 Evaluation Report also did not appropriately assess his memory, lacking any phonological memory assessment or thorough assessments of short- and long-term memory functioning despite his teacher's elevated rating of Michael's working memory, his significant discrepancy between his higher visual spatial abilities and his lower working memory abilities, and his impaired phonological processing.

74.     Finally, the 2018 Evaluation Report did not include an assessment of Michael's

focus and attention.

75.    Based on its inadequate 2018 Evaluation Report, the District proposed an inappropriate IEP for Michael.

76.    On January 15, 2019, the Family participated in the IEP meeting with the District.

77.    The January 2019 IEP lacked objective data relating to Michael's needs and goals and only included generic explanations and overall grade averages.

78.    The January 2019 IEP included only two goals for Michael: one in letter identification and one in phonological processing, both of which contained unambitious expectations.

79.    The IEP did not include goals in the other identified areas of need identified in the Evaluation Report such as reading comprehension, reading fluency, spelling, and self-monitoring.

80.    The Specially Designed Instruction in the IEP lacked direct instruction in a research-based reading, written expression, and/or executive functioning program.

81.    The District proposed that Michael would be educated in a general education classroom with general education curriculum, and he would be pulled out every day for 60 minutes of learning support in small group with other children.

82.    The IEP lacked any explanation of the instruction that Michael would receive during learning support.

83.    The IEP did not include one-to-one instruction as recommended by the District.

84.    Ultimately, the Family concluded that the 2019 IEP would not meet Michael's needs; accordingly, the Family sought an alternative placement for him.

85.    In 2019, Michael attended Benchmark's summer program where he received one hour and 45 minutes of language arts instruction each day and experienced success.

86.    Michael attended Benchmark for the 2019-2020 school year.

87.     Benchmark School is an accredited private school with the Pennsylvania Association of Independent Schools.

88.     Benchmark specifically works with students with average intelligence and learning difficulties and/or executive functioning issues.

89.     At Benchmark, learning support literacy techniques for students with disabilities are embedded in every subject; Michael, therefore, does not need to be pulled out of the classroom for services. All instructors are closely supervised and extensively trained in the literacy techniques to cue students in the context of science, social studies and math using grade level reading material. Students receive weekly technology instruction to learn word processing techniques and assistive software. Individualized attention, small class size, and differentiated pacing and accommodations are built into Benchmark's program.

90.     Michael's classroom at Benchmark is comprised of nine students and has two full-time teachers as well as an instructional assistant.

91.     At Benchmark, Michael receives two and a half hours daily of language arts and 55 minutes of math. In groups of three to four peers, students receive half an hour of instruction focused on word identification (i.e. decoding, spelling, and fluency); a half an hour of small group directed reading instruction at the student's reading level targeting reading comprehension strategies; a half an hour of structured independent reading; and a half an hour of writing instruction.

92.     Benchmark utilizes research-based programs to target decoding, reading fluency, reading comprehension strategies, and writing.

93.     After two months at Benchmark, the Family noticed marked improvement in Michael, including a new love for attending school, willingness to read at home, and confidence in his abilities.

94.      When Michael entered Benchmark in second grade, he was identified to be reading at a "readiness" or "pre-primer" level, which typically would be a kindergarten level. Over the course of his time at Benchmark, Michael has progressed through "pre-primer," "primer," and "level one" (first grade) reading. A supervisor at Benchmark opined that for someone with significant learning difficulties such as Michael, this constitutes meaningful progress.

95.      In October 2020, the Parents contacted the District's school psychologist to discuss enrolling Michael in the District.

96.      Parents and the school psychologist communicated via phone and several times via e-mail.

97.      Parents asked for an offer of programming for 2021-2022 should they enroll Michael in the District.  Parents indicated their desire that Michael enroll in the District and requested that the District offer him an IEP that addressed his significant reading and executive functioning needs.

98.      The school psychologist advised the Parents that the School District would not offer him an IEP until the Parents withdrew Michael from Benchmark and enrolled him in a District school. She also advised that the District would implement the outdated, draft January 2019 IEP and hold a meeting to review the IEP within 30 days. She stated that the District would not reevaluate or update the IEP until after Michael's physical entry into the District's classrooms.

99.      The outdated, draft January 2019 IEP expired January 2020, nine months before the Family contacted the District.

100.    The District never requested permission to reevaluate or offered an updated IEP for the 2020-2021 or 2021-2020 school years.

101.    The Parents always provided consent to the District to conduct any evaluation it

requested or obtain any records from Benchmark. The Parents have attended and fully participated in all IEP meetings to which they were invited. All equities of this matter weigh in favor of Plaintiffs.

**VIII.   The Hearing Officer's Errors**

102.   The Plaintiffs incorporate by reference the preceding paragraphs.

103.   Pursuant to the above standards, the District unquestionably failed in its statutory duties to Michael and the Hearing Officer erred in ruling otherwise and in failing to award tuition reimbursement as relief.

104.   Hearing Officer Cutrona incorrectly determined that the District's December 2018 Evaluation Report was appropriate; rather, it was not comprehensive as a matter of law due to its lack of necessary additional assessments including in the areas of reading, written expression, attention/focus, and memory.

105.   Ms. Cutrona erred in finding that the January 2019 IEP was appropriate. The January 2019 IEP was facially, legally inappropriate due to its: (i) insufficient Present Educational Levels lacking any objective measures of Michael's academic or functional performance; (ii) minimal and incomprehensible Goals, which fail to address several critical areas of need identified by the District; and (iii) lack of any Direct Instruction in a Research-Based reading, written expression, and/or executive functioning intervention.

106.   The IEP's Present Levels of Educational Performance included only generic descriptions of Michael's abilities and reference to his overall grade averages, which are not specific enough to provide appropriate information on Michael's present level of academic achievement and functional performance.

107.   Ms. Cutrona erred by finding the IEP was appropriate as it lacked any Research-

Based Instruction. The IEP's reference to multimodal/multisensory instruction—a phrase which only denotes that students will use more than one sense, e.g. that they may hear information and then see a visual pertaining to that information—is not the same as Research-Based Instruction to target specific areas of need.

108.    The IEP impermissibly lacks any description of the interventions to be used in the learning support class.

109.    Hearing Officer Cutrona erred when she found that the availability of "several" research-based curricula in the District which would have been selected after Michael began his education in-District excused the IEP's complete lack of reference to *any* Research-Based Instruction. This, contrary to established precedent, allowed the District to supplement the IEP document with after-the-fact testimony about resources that were not included in the IEP itself nor discussed with, or available to, the Parents.

110.    Similarly, Ms. Cutrona erroneously allowed the District to supplement the IEP document by explaining the written expression supports in the general education curriculum. The IEP does not include any individualized support for Student's identified written expression need in spelling.

111.    Hearing Officer Cutrona incorrectly excused the IEP's lack of support for Michael's identified executive functioning needs by crediting the psychologist's testimony, which contradicts the findings in the Evaluation Report itself.

112.    Ms. Cutrona incorrectly concluded that the District had no obligation to offer an IEP for Michael for the 2020-2021 and 2021-2022 school years.

113.    First, Hearing Officer Cutrona erred in finding that Parents did not request an evaluation. On December 21, 2020, Parents wrote to the District to ensure that they understood the

information conveyed by the school psychologist about enrolling Michael, inquiring, "Before the district will reevaluate and revise his IEP, we need to withdraw him from his current school. Then after 30 days, we will meet to discuss changing his IEP. Is that correct?" The District's confirmation of this grossly incorrect enrollment requirement also confirmed that the District was violating its statutory duty to evaluate Michael and offer an updated, appropriate IEP to the Family before the Student enrolled in the District. Parents, therefore, sought and inquired about a reevaluation and acted in reliance of the District's express statements that a reevaluation would only occur after enrollment. It would be illogical for Parents to request an evaluation after being told that it would only occur after enrollment, and it was unlawful for the District to require enrollment before agreeing to evaluate the Student and before offering an updated IEP.

114.   Second, Ms. Cutrona's decision is legally incorrect in ignoring the Parent's clear intent to receive an offer of a program/placement in the District and in restricting the analysis to whether Parents re-enrolled Michael or formally requested an evaluation after being provided inaccurate information about obtaining an evaluation and an IEP. *See* Decision at 16 ("So the next question here is, did the Parents enroll the Student in the District or request an evaluation for the 2020-2021 or the 2021-2022 school year?").

115.   Hearing Officer Cutrona ignored that the Family requested an offer of FAPE, manifested an intent to enroll Michael in the District, asked the District about reevaluating Michael, and asked about revising the IEP.

116.   It was the District's non-delegable duty to offer FAPE to Michael's Parents before the Parents enrolled Michael in-District, yet it failed to offer any IEP, other than an expired January 2019 IEP for the 2020-2021 and 2021-2022 school years.

117.   Having established that the District failed to offer Michael FAPE during the 2019-

2020, 2020-2021, and 2021-2022 school years, the Family unmistakably fulfilled the first prong of the *Burlington/Carter* tuition reimbursement analysis, and Hearing Officer Cutrona erred in concluding to the contrary.

118.    Because Ms. Cutrona mistakenly found that the District offered Michael a FAPE for 2019-2020 and that the District did not need to offer FAPE for 2020-2021 and 2021-2022, she did not consider the two additional prongs of the tuition reimbursement analysis: the appropriate-ness of the private school, and whether the equities call for any reduction in the tuition award. However, it is clear that the Parents met their burden of proof regarding these prongs as well.

119.    Benchmark is appropriate given its research-based programs, learning support lit-eracy techniques embedded throughout the school day, differentiation of instruction, small class size, and Student's progress during his time there including in reading and socially/emotionally.

120.    Parents have cooperated with the District's reevaluation and participated in any meeting to which they were invited. After the District was indisputably on notice of Parents' dis-agreement with the proposed programming it failed to reevaluate or offer an updated IEP.

121.    The Hearing Officer therefore erred in not awarding tuition reimbursement under not only IDEA, Section 504 as well.

122.    Michael is a student who, at all times relevant to this Complaint, is and was disa-bled, and is and was otherwise qualified to participate in, and receive equal benefits from, the Defendant's educational programs with appropriate instruction, accommodations and supple-mental supports for purposes of Section 504.

123.    The evidence established that the District violated Section 504 by failing to appro-priately evaluate Michael and failing to provide or offer Michael an appropriate program that meaningfully addressed his disabilities, all of which denied him meaningful educational benefit.

124.    The evidence established that the District violated the ADA for the same reasons that it has violated the IDEA and Section 504, all of which excluded Michael from participation in and denied Michael the benefits of the services, programs, or activities of a public entity and subjected him to discrimination.

**WHEREFORE**, the Plaintiffs respectfully requests that this Court:

1.    Assume jurisdiction over this action;

2.    Hear additional evidence as requested by a party pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

3.    Reverse the Hearing Officer's Decision and award the Family tuition reimbursement and related costs for the 2019-2020, 2020-2021, and 2021-2022 school years at Benchmark Academy;

4.    Order the Defendant to pay Plaintiffs' reasonable attorneys' fees and related costs;

5.    Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, ADA and Pennsylvania law; and

6.    Grant such other relief as this Court deems proper.

Respectfully submitted,

Jacqueline C. Lembeck, Esquire
PA ID No. 314535

Michael J. Connolly, Esquire
PA ID No. 82065

24

Dennis C. McAndrews, Esquire
PA ID No. 28012

Jennifer P. Grobe, Esquire
PA ID No. 323085

McANDREWS, MEHALICK, CONNOLLY,
HULSE and RYAN, P.C.
30 Cassatt Avenue
Berwyn, Pennsylvania 19312
Tele: 610-648-9300
Attorneys for Plaintiffs