## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL F., *by and through his parents*,
KEVIN F. and KELLY F.,

                    *Plaintiffs,*

      v.

UPPER DARBY SCHOOL DISTRICT,

                  *Defendant.*

CIVIL ACTION
NO. 21-5653

**PAPPERT, J.**                                                                 **April 6, 2023**

### MEMORANDUM

    Parents Kevin and Kelly F., on behalf of their son Michael, filed a special education due process complaint against Upper Darby School District alleging the District violated the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990 during the 2019–2020, 2020–2021, and 2021–2022 school years.  Specifically, they contend the District failed to provide their son a free appropriate public education when it proposed an allegedly inappropriate individualized education plan in January of 2019 based on what they felt was an insufficient evaluation.

    Michael's parents further allege that the District again denied Michael a FAPE when it refused to reevaluate him in October of 2020.  They request reimbursement for Michael's private school tuition for the 2019, 2020 and 2021 school years.  A Pennsylvania Special Education Hearing Officer ruled against the parents, finding the District offered Michael a FAPE under the IDEA and Section 504 in January of 2019

1

and was not obligated to reevaluate him in October of 2020. (Administrative Decision 18, ECF 5-3.)

Michael's parents filed this lawsuit seeking reversal of the Hearing Officer's decision and the parties both move for judgment on the administrative record.  After a careful review of that record, the Hearing Officer's Final Decision and Order and the parties' submissions, the Court affirms the Hearing Officer's ruling and enters judgment in favor of the District.

I

Michael, a now eleven-year-old boy living in the Upper Darby School District, is a hard-working student who suffers from Specific Learning Disabilities.  (Hrg. Tr. Day 1 115:15–22, ECF 5-7; Ex. 2 p. 11, ECF 5-9.)   Michael's parents and teachers first noticed him struggle with reading while in pre-school at St. Dorothy's, his local parochial school.  (Hrg. Tr. Day 1 42:10–21; Ex. 2 p. 1.)  Despite receiving individualized attention and reading support at St. Dorothy's, Michael fell further behind his classmates as he progressed through kindergarten and first grade.  (*Id*.) Michael's parents contacted the District in the fall of 2018 and formally requested an evaluation.  (*Id*.)

A

Aronimink Elementary's School Psychologist, Jennie Katz, evaluated Michael. (Hrg. Tr. Day 1 90:4–13.)  Ms. Katz gathered input from Michael's parents and classroom teacher at St. Dorothy's, requested and reviewed his school records, observed him in class, and administered a battery of standardized tests.  (*Id*. at 94:15–95:17,

95:24–96:15.)   She concluded Michael suffered from Specialized Learning Disabilities and required an IEP.  (*Id*.)

Michael's parents reported they first noticed him struggle with letters while he was in preschool.  (Ex. 2 p. 1.)  His difficulties persisted through kindergarten, and by first grade he remained unable to pick up sound-symbol correspondence, despite support from the St. Dorothy's reading specialist, a separate Wilson tutor and in-classroom guidance.  (*Id*.)  His parents also reported that, while Michael "love[d] school" and was motivated to learn, homework was difficult and took up to an hour each night. (*Id*.)

Michael's teacher, Ms. O'Connor, expressed similar concerns.  (Ex. 2 p. 4.)  She reported that Michael struggled with identifying letters and sounds and retaining and retrieving information, required one-on-one instruction for reading and writing and needed to be reminded to use the strategies he'd been taught.  (*Id*.)  Michael's reported strengths were following instructions, completing homework assignments, behavior and friendships while his weaknesses included organizational skills, in-class task completion, independent reading assignments, oral reading assignments, grasping new skills, following written instructions, mastery of perquisite skills, and test and note-taking skills.  (*Id*.)  His struggles primarily included reading and writing; he was unable to complete a constructed response even with one-on-one teacher prompting and had difficulty staying on task.  He also struggled to find pages in his book higher than one hundred and could not consistently recognize three-digit numbers.  (*Id*.)  Ms. O'Connor recommended that Michael would benefit from a small classroom setting and

more direct instruction, noting her inability to give him the one-on-one attention he needed to keep up in the classroom.  (*Id*.)

Ms. Katz observed Michael for "20 to 35 minutes" in the classroom at St. Dorothy's.  (Hrg. Tr. Day 1 95:3–96:15.)  During that time, he repeatedly required help with a writing assignment.  (*Id*. at 97:3–7; Ex. 2.)  Ms. O'Connor took time to work with Michael individually on the assignment, but he still had difficulty reading back what he wrote and identifying the conclusion of a story read aloud in class.  (Ex. 2 p. 3.)  Ms. Katz also observed Michael become distracted when his peers started to turn in their work and saw him submit his work before it was complete to avoid being the last student to finish.  (Ex. 2 p. 3.)

In the course of her evaluation, Ms. Katz administered two comprehensive standardized tests: the WISC-V and KTEA-3.  (Hrg. Tr. Day 1 100:12–20.)  The WISC-V is a general assessment that determines a full-scale IQ and breaks down its results by subject area, giving the evaluator specific indications of the students' cognitive strengths and needs.  (*Id*. at 101:11–20.)  The test revealed that Michael is of average intelligence and can learn efficiently.  (*Id*. at 101:7–102:18.)  The KTEA-3 gives phonological processing subtests that specifically looked at Michael's ability to manipulate phonemes within words.  (*Id*. at 102:19–103:15.)  Ms. Katz noted that she didn't administer all available assessments; reading fluency questions, for example, would not have been additive in assessing Michael's condition because he didn't grasp fundamental concepts.  (*Id*. at 103:21–104:1, 149:5–150:7.)  Finally, Ms. Katz administered the behavior rating inventory of executive functioning ("BRIEF") examination which tests multistep issues to determine behavioral accommodations the

child may need in the classroom. (Hrg. Tr. Day 1 109:15–110:3.) Based on this information, Ms. Katz diagnosed Michael with Specific Learning Disabilities. (*Id.* at 115:20–22; Ex. 2 p. 11.)

B

Ms. Rebecca Schafer, an Aronimink Special Education Teacher, helped develop Michael's proposed IEP in 2019. (Hrg. Tr. Day 2 256:20–257:3.) She spoke with Michael, his parents and his first-grade teacher. (*Id.* at 258:15–20.) She conducted numerous activities and exercises to determine appropriate goals based on Michael's needs, which included letter identification and letter sounds. (*Id.* at 258:24–259:20; Ex. 4.) Ms. Schafer formally identified a need for phonemic and phonological awareness. (Hrg. Tr. Day 2 261:11–262:2; Ex. 4 p. 12–13.) In her opinion, it was important for Michael to master foundational reading skills before pursuing more advanced goals. (Hrg. Tr. Day 2 263:12–19.)

Under the proposed IEP, Michael would receive a research-based decoding program, 60 minutes of intervention a day, and spend the rest of his day in a regular classroom. (Hrg. Tr. Day 2 268:12–269:7; Ex. 4 p. 14.) Classroom time included a 90-minute block of reading, the last 30 minutes of which in small groups, where students are matched by ability. (*Id.* at 269:5–270:10.) Michael would also receive 30 minutes of a multi-tiered support system, where all students receive pull-out intervention with a research-based reading program. (*Id.*)

Michael's proposed IEP had two primary goals: a nonsense words goal and a rhyming goal, developed to target his identified needs: phonemes and phonological processing. (Hrg. Tr. Day 1 127:19–128:21; Ex. 4.) While other areas of need, such as

5

decoding, were not designated as separate "goals," they were addressed by the specially designed instruction components of the proposed IEP.  (Hrg. Tr. Day 1 129:3–22.)

Michael's parents met with the IEP Committee to review Ms. Katz's evaluation report and the District's proposed plan.  (*Id*. at 48:5–22).  They raised no objections to the proposed IEP, nor did they sign the Notice of Recommended Education Placement ("NOREP") form.  (*Id*. at 29:18–30:7, 51:16–52:8; Ex. 5.)  The NOREP form gives parents three options after an IEP meeting: accept the IEP, request an informal meeting to discuss the recommendations, or reject the IEP and pursue mediation or a due process hearing.  (Ex. 5.)  That same day Michael's parents did, however, acknowledge receipt of their procedural safeguards, which outlined Michael's rights under the IDEA.  (Hrg. Tr. Day 1 71:19–22; Ex. 4 p. 20.)

C

Two days after meeting with the IEP team, and without telling anyone at Aronimink or the District, Michael's parents submitted an application to Benchmark, a private school.  (Hrg. Tr. Day 1 54:16–55:1; Ex. 6 p. 27.)  Benchmark specializes in educating students with disabilities by providing them specialized support in a small classroom setting.  (Hrg. Tr. Day 1 58:9–24.)  Michael attended a 5-week camp at Benchmark that summer, and ultimately enrolled in the school full-time for the 2020–2021 school year.  (*Id*. at 56:1–17, 57:23–58:8.)

The District did not hear again from Michael's parents until October of 2020, when Michael's mother spoke to Ms. Katz and his father then asked Ms. Katz to tell him what he needed to do to "get Michael.in [sic] to Aronimink."  (Ex. 7, ECF 5-9.)  Ms. Katz replied that "once Michael is enrolled with the district, he is automatically

considered for special education services as described" in her 2018 evaluation.  (*Id*.)

She said the "[2019] Individualized Education Plan (IEP) will be followed for the initial

30 days, until we can get updated curriculum-based measures that will help us amend

and streamline the document to reflect Michael's current skills."  (*Id*.)  Michael's

mother followed up to confirm, writing:

> Just to make sure the process is clear so I don't make a mistake. We just
> have to enroll Michael in Upper Darby School District so he is able to
> start at Aronimink. Before the district will reevaluate and revise his IEP,
> we need to withdraw him from his current school. Then after 30 days, we
> will meet to discuss changing his IEP. Is that correct?

(*Id*.)

Ms. Katz replied that the summary was "correct," and Michael would be

reevaluated no later than 30 days after returning to school.  (*Id*.)  While Ms.

Katz did not tell Michael's parents they also had a right to request a

reevaluation at any time, she testified that she interpreted their question to be

about enrolling him in the school, not a reevaluation.  (*Id*., Hrg. Tr. Day 1

136:21–137:10.)  Ms. Katz included her cell phone number and encouraged

Michael's parents to call or email her if they had any other questions.  (Ex. 7.)

They never did.

## II

A district court applies a "modified *de novo*" standard when reviewing an

administrative hearing officer's decision under the IDEA and Section 504.  *D.S. v.

Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010).  Conclusions of law receive

plenary review.  *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 528 n.3 (3d

Cir. 1995).  The hearing officer's factual findings are considered *prima facie* correct, and

if the Court departs from those findings, it must explain why.  *D.S.*, 602 F.3d at 564.

The Court must accept the hearing officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Id.* (emphasis omitted) (internal quotation omitted). "The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012) (quotation omitted). The party challenging the hearing officer's decision—here, Michael's parents—bears the burden to "persuade the factfinder that one's propositions of fact are indeed true." *Id.* at 270–71 (quoting *El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007)).

Claims under Section 504 of the Rehabilitation Act and the ADA are reviewed *de novo. See K.N. v. Gloucester City Bd. of. Educ.*, 379 F. Supp. 3d 334, 344 (D.N.J. 2019) (citing *T.F. v. Fox Chapel Area Sch. Dist.*, 589 F. App'x 594, 598 (3d Cir. 2014)).

A

The IDEA requires states receiving federal education funding to provide a FAPE to all children with disabilities. 20 U.S.C. § 1412(a)(1). "A FAPE . . . includes both 'special education'"—instruction specially designed to meet the child's unique needs—and "related services'"—"the support services required to assist a child to benefit from that instruction." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (citations omitted) (cleaned up). To meet its FAPE obligation, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 399. Whether the District met its FAPE obligation is a question of fact. *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009).

The substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. *See id.*; *James S. ex. rel. Thelma S. v. School Dist. of Phila.*, 559 F. Supp. 2d 600, 620 (E.D. Pa. 2008). To prove a violation of Section 504, a plaintiff must show he is "disabled" under the Act, "otherwise qualified" to participate in school activities, the school district receives federal financial assistance, and he was excluded from participation in, denied the benefits of, or subject to discrimination at the school. *Andrew M. v. Delaware County Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007). A violation of Section 504 constitutes a violation of the ADA. *See James S*, 559 F. Supp at 622 (citing *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996)).

## B

If a school district's IEP is inappropriate, and the student's parents obtain an appropriate private school program instead, the district must reimburse any tuition payments. *School Comm. Of Burlington v. Dept. of Educ. Of Massachusetts*, 471 U.S. 359, 370–71 (1985); 34 C.F.R. § 300.148(c). To determine whether tuition reimbursement is warranted, a court must first decide whether the district offered an appropriate program. If a court finds the district did not offer the student a FAPE, it then evaluates whether the parents' chosen program was appropriate, and whether there are equitable considerations that merit a reduction or elimination of a reimbursement award. *Id.*

III

The Hearing Officer concluded that the "District offered the student a FAPE under the IDEA and Section 504" and that the "Parents have failed to carry their burden of proof on the claim for tuition reimbursement by the School District for Parents' unilateral private placement for the 2019–2020, 2020–2021, and 2021–2022 school years." (Administrative Opinion 18.)  The Court agrees.

A

1

The IDEA requires a school district to evaluate each child with a disability.  34 C.F.R. § 300.304(c)(6).  The evaluation must consist of a procedure to "determine if the child is a child with a disability under the IDEA," and it must be "sufficiently comprehensive to identify all of the child's special education and related needs, whether or not commonly linked to the disability category in which the child has been classified."  *Id*.; 300.301(c)(2); 300.304(c)(4).

The initial evaluation must include information from the child's parents, classroom assessments and observations, and reports by teachers and related services providers.  34 C.F.R. § 300.305(a)(1); 20 U.S.C. § 1414(c)(1)(A).  Under the IDEA, the evaluation process shall:

1. Use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent;

2. Not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child; and

3. Use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental

factors.

34 C.F.R. § 300.304(b); 20 U.S.C.§ 1414(b)(2)(A).

2

His parents allege that Michael's evaluation was not comprehensive because it (1) lacked necessary assessments in reading, writing, attention and memory and (2) inadequately assessed his reading and writing.  (Pl. Mot. Judgment 16, ECF 10-1.)  Ms. Katz complied with the IDEA's requirement to collect information from Michael's parents and teachers, including assessments and observations, and to conduct an in-class observation.  *See* (Ex. 2).   She also administered three standardized tests, the WISC-V, KTEA-3 and BRIEF.  (Ex. 2.)

The Hearing Officer correctly found the tests were comprehensive. (Administrative Opinion 10–11.)  Michael took the KTEA-3 subtests for reading, math, writing and listening, and Ms. Katz detailed the scores and explained his results in her report. (Ex. 2 p. 7.)[1]  The WISC-V tested Michael's working memory.  (*Id*. at 5–6.)  Ms. Katz testified that Michael's results were average, and his memory was on par with his age-matched peers.  (Hrg. Tr. Day 1 147:3–14.)  While Ms. Katz did omit certain subtests, including one for reading fluency, the Hearing Officer credited her testimony that those assessments would not prove insightful, and the Court finds no reason to disagree.  (Administrative Opinion 10; Hrg. Tr. Day 1 149:10–150:4.)

Ms. Katz evaluated information from multiple sources using varied assessments and strategies.  There was no evidence presented at the hearing that her methods were technically unsound.  For these reasons, the Court affirms the Hearing Officer's

---

[1]      The Hearing Officer found each of the witnesses who testified before her to be "candid, credible and convincing."  (Administrative Opinion 8).

conclusion that the "2018 evaluation was appropriate and meets the requirements as set forth in IDEA and its implementing regulations." (Administrative Decision 11.)

B

1

The Court must next determine whether the District offered "an educational program reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 580 U.S. at 403. This standard is neither a hollow mandate nor "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 404. A court "may not rely on hindsight to second-guess an educational program that was reasonable at the time," so the analysis must turn on the information available to the District in January of 2019. *K.D. ex rel. Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 255 (3d Cir. 2018); *see also Endrew F.*, 580 U.S. at 399. The focus must remain on whether the program the District offered was appropriate, not whether Benchmark's program—or any other alternative—was better. *See Endrew F.*, 580 U.S. at 399 ("[T]he question is whether the IEP is *reasonable*, not whether the court regards it as ideal." (emphasis in original)); *Ridley*, 680 F.3d at 278–79 (schools have discretion to select from various methods of meeting students' needs and have flexibility to balance disabled students' needs with financial and administrative concerns).

2

Michael's parents claim the proposed IEP was improper because it would have placed him in a regular educational environment with pull-out support, as he received

at St. Dorothy's.[2]  (Hrg. Tr. Day 1 53:12–24.)  They believed pull-out services were insufficient because Michael hadn't improved while at St. Dorothy's.  (*Id*. at 57:22–58:8.)  The record shows the District's January 2019 plan to educate Michael was reasonable.

The January 2019 IEP included two goals: (1) a nonsense word goal and (2) a rhyming goal.  (Ex. 4 p. 12–13).  These goals were designed with Michael's needs in mind, specifically phonemes, decoding and phonological processing.  (Hrg. Tr. Day 1 126:17–129:21.)  It proposed 60 minutes per day of itinerant reading support, plus an additional 30 minutes of reading per day through the multi-tiered support system time, where students worked with a reading specialist or learning support teacher using a research-based curriculum.[3]  (Hrg. Tr. Day 2 269:5–10.)

The IEP adequately presented Michael's present levels of academic achievement and performance, detailing how his disability impacted his education and specific areas where it held him back.  *See* 20 U.S.C. § 1414(d); (Ex. 4 pp. 7–8).  It includes input from his parents, his classroom teacher, in-class assessments and grades, and Ms. Katz's own observations.  *Id*.  The Hearing Officer found the IEP team "properly took the results of the [evaluation report] into consideration…"  (Administrative Opinion 15.)

---

[2]    Students are temporarily "pulled out" of the general education classroom to receive more individualized instruction in a small group or one-on-one setting.  *See, e.g.*, (Hrg. Tr. Day 2 267:14–268:4).

[3]    Michael's parents argue that the Hearing Officer incorrectly relied on "after-the-fact testimony" when evaluating the reasonableness of the IEP.  (Pl. Mot. Judgment 14.)  She did not; the Hearing Officer properly considered testimony from District personnel to determine the adequacy of Michael's evaluation and proposed IEP.  The Hearing Officer's credibility determinations are appropriate findings of fact, and school officials' testimony provides context to the evaluation and IEP.  Reliance on this testimony does not "materially alter" the IEP, as Parents contend.  *See* (Pl. Mot. Judgment 14.).

It also appropriately incorporated reading comprehension.  Ms. Shaffer, a special education teacher who helped develop the IEP, testified that there are several research-based decoding curricula available, and a specific curriculum would be selected based on Michael's needs.  (Hrg. Tr. Day 2 at 268:7–17.)  At Aronimink, research-based reading intervention is taught in small groups, where students of similar needs and skills are paired together.  (*Id.* at 269:18–270–10.)  While Michael's parents complained about class size, Aronimink has fewer students per-class than St. Dorothy's, on average, and Benchmark's class size is irrelevant.  *See Endrew F.*, 580 U.S. at 399.

Similarly, while Michael's parents contend the IEP did not include written expression or executive functioning supports, Ms. Schaffer testified that the writing curriculum is constantly administered as it is incorporated in math, reading, science and social studies classes.  (Hrg. Tr. Day 2 270:14–20.)  The Hearing Officer credited Ms. Katz's testimony that Michael's executive functioning issues were related to his lack of self-confidence in reading, not executive functioning as a whole, and that no accommodations were needed.  (Administrative Opinion 14, Hrg. Tr. Day 1 150:17–151:13.)

The Hearing Officer also found that the IEP contained adequate specially designed instructions, including teaching methodology and task explanation.  (Administrative Opinion 14–15.)  This included "chunking" to adapt the complexity of the task,[4] frequent checks for understanding during independent work; multi-sensory approach to instruction; the use of a highlighter to mark key words; paired verbal/visual presentation of new concepts and skills; multi-modal instructional

---

[4]     Breaking down instructions and assignments into simpler, more manageable "chunks."  *See, e.g.*, (Administrative Opinion 3–4).

strategies; simplify and chunk verbal instructions at a slower pace; adapted homework; and a whisper phone.  (Ex 4 p. 14.)

The Hearing Officer was correct to conclude the 2019 IEP was reasonably calculated to enable Michael to make progress appropriate in light of his circumstances. *Endrew F.,* 137 S. Ct. at 1001.

C

1

Michael's parents next argue the District was required to reevaluate Michael in response to their October of 2020 email exchange with Ms. Katz.  If a parent of a disabled child chooses to forego the public school services, the student is not entitled to the same level of service as a public school student.  *See* 20 U.S.C. § 1412(a)(10)(A).  To trigger a public-school district's responsibilities under IDEA, a parent who enrolls a child in a private school must either request an evaluation or begin the public school enrollment process.  *A.B. through Katina B. v. Abington Sch. Dist.*, 841 F..App'x 392, 395 (3d Cir. 2021) (citing *C.H. v. Cape Henlopen School Dist.*, 606 F.3d 59, 67 (3d Cir. 2010).  While a parent need not affirmatively enroll their child in public school to receive an offer of a FAPE, she must either "manifest an intent to enroll the child or request an evaluation."  *Id.*  The right of review "contains a corresponding parental duty to unequivocally place in issue the appropriateness of an IEP."  *Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999) (citing *Bernardsville Bd. of Educ. v. J.H. ex rel. J.H.,* 42 F.3d 149, 156–58, n. 14 (3d Cir. 1994)).  Under the plain terms of the statute, "general expressions of concern" do not "constitute a 'parental request for evaluation.'"  *A.B.,* 841 F. App'x at 396 (quoting *D.K.*

15

*ex. rel. Stephen. K. and Lisa K. v. Abington Sch. Dist.*, 696 F.3d 233, 247 n.5 (3d Cir. 2012)).

2

Michael's parents' communications with Ms. Katz concerned the enrollment process generally, and they never manifested an intent to enroll their son at Aronimink.  *See* (Ex. 7).  Michael's mother testified that she initially spoke to Ms. Katz on the phone in October of 2020 and asked what she had to do to "transition Michael back into Aronimink."  (Hrg. Tr. Day 1 65:12–16.)  In a follow-up email, Michael's father reiterated this question, asking Ms. Katz how to get Michael "in" to the school.  (Ex 7.)  She replied they had to enroll Michael in the District, at which point he would be "automatically considered eligible for special education services."  (*Id*.)  She explained that the 2019 IEP would be in place for the initial 30 days, but the curriculum would be updated to meet Michael's needs within his first month of attending.  (*Id*.)  Michael's parents confirmed they understood they had to "enroll Michael in Upper Darby School District so he is able to start at Aronimink."  (*Id*.)  They never did so, nor did they ask Ms. Katz to help them begin the enrollment process.

They did not request an evaluation for Michael either.  While his parents asked Ms. Katz to confirm whether they "need to withdraw [Michael] from his current school" before the district would "reevaluate and revise his IEP," this was part of a broader response to Ms. Katz's discussion of the enrollment process.  (Ex. 7; Hrg. Tr. Day 1 136:21–137:10.)  Ms. Katz reasonably interpreted their inquiry to concern how to begin the process of getting Michael enrolled at the school.  (*Id*.)  The Hearing Officer credited this testimony.  (Administrative Opinion 16.)   She reviewed this email exchange in the

context of Ms. Katz's and Michael's parents' testimony and, based on all the evidence, determined the parents did not manifest an intent to enroll Michael or unequivocally place in issue the appropriateness of Michael's IEP.  *See* (*id*.).

Michael's parents knew how to request an evaluation—they did so in the fall of 2018 and signed a form acknowledging their receipt of procedural safeguards after the January 2019 IEP meeting.  (Hrg. Tr. Day 1 71:19–22; Ex. 4 p. 20.)  "General expressions of concern" do not "constitute a parental request for evaluation."  *D.K.*, 696 F.3d at 247 n.5; *see Bernardsville,* 42 F.3d at 156–58, n. 14.  Again, the Hearing Officer's factual findings are considered *prima facie* correct, and the Court must explain its departure from them.  *D.S.*, 602 F.3d at 564.  The Court must accept the Hearing Officer's credibility determinations unless non-testimonial, extrinsic evidence in the record justifies a contrary conclusion.  *Id*.  To the extent Michael's parents attempt to argue their exchanges with Ms. Katz in the fall of 2020 manifested an intent to enroll Michael in the District or request his reevaluation, these exchanges are, at best, general in nature and do not justify conclusions contrary to the Hearing Officer's.  *See D.K.*, 696 F.3d at 247 n. 5.

## IV

Finally, Michael's parents argue they are entitled to tuition reimbursement because the District incorrectly told them Michael must "receive the services outlined in an inappropriate and expired IEP" for the first month of school and "refused" to reevaluate him sooner.  (Pl. Mot. Judgment 19.)  They do not contend the District failed to provide them with notice of their procedural safeguards, as required by 20 U.S.C. § 1415(d)(1)(A), nor do they claim that Ms. Katz's response to their question somehow

usurped their statutory right to request a reevaluation detailed in 20 U.S.C. §

1414(a)(2)(A).

For the reasons just explained, Michael's parents did not trigger the District's

obligation to reevaluate their son.  While the Hearing Officer did not directly address

this issue, to the extent the parents may contend they did not enroll Michael in the

District because Ms. Katz told them he would be educated under the 2019 IEP for

thirty days, any miscommunication is, at most, a procedural violation that does not

constitute denial of a FAPE.

### A

Failure to have an IEP in place at the start of the school year is considered a

procedural violation of the IDEA.  *C.H.*, 606 F.3d at 67–68 (quoting 20 U.S.C. §

1414(d)(2)(A).  A procedural violation of the statute "is not a *per se* denial of a FAPE."

*Id.* (quoting *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765 (6th Cir.

2001)).  A school district's failure to comply with procedural requirements of the Act

"constitute[s] a denial of a FAPE only if such violation causes substantive harm to the

child or his parents."  *Id.*  Violations are substantive if they can meaningfully be said to

have "impeded the child's right to a FAPE" or "caused a deprivation of an educational

benefit."  *Id.* (quoting C.F.R. § 300.315(a)(2)(i), (iii)).

### B

In the absence of evidence of educational deprivation, "a specific period of time

without an IEP does not rise to denial of a FAPE."  *C.H.,* 606 F.3d at 67–68.   In *C.H.*, a

student was unilaterally placed in a private school.  *Id.* at 63.  Like Michael's parents

here, C.H.'s parents requested tuition reimbursement based, in part, on the fact that

the student was not offered a FAPE on his first day of school in the District.  *Id*. at 65.
The Court concluded that, absent evidence of educational loss, the District could not be
liable.  *Id*. at 69.

Ms. Katz and the District demonstrated "consistent willingness to evaluate"
Michael.  *See id*.  Ms. Katz's emails reenforced the District's commitment to Michael,
set out their plan to modify his IEP, and invited his parents to ask any questions.  *See*
(Ex. 7).  The District is not obligated to "preemptively advise parents of their right to
have their child evaluated," beyond distributing procedural safeguards, and either way
Michael's parents have not established causation: they were not "prevented from
requesting a hearing" by Ms. Katz's response to their enrollment questions.  *See D.K.*,
696 F.3d at 247–248.  They have a corresponding duty to "unequivocally place in issue
the appropriateness of an IEP," and, again, they never "manifested an intent" to enroll
Michael or requested his reevaluation.  Furthermore, his 2018 evaluation was current:
evaluations must be conducted at least once every three years, and Michael's was less
than two years old in October of 2020.  20 U.S.C. § 1414(a)(2); (Ex. 2).

Michael's parents cannot show the District's failure to develop an IEP on the
first day of classes would have caused a lost education benefit because Michael never
attended a class in the District.  *See C.H.,* 606 F.3d at 68–69.  The only factor to
determine is "whether the failure to have the IEP in place is, itself, the loss of an
educational benefit."  *Id*.  There is no evidence in the record that learning under the
2019 IEP for a brief time would have created educational loss.  *Id*.  Because his parents
did not request an evaluation or manifest an intent to enroll Michael in the District,
and his initial evaluation was less than three years old, the District is not responsible

19

for any miscommunication that, at worst, would have resulted in a procedural violation of the statute.  *See C.H.*, 606 F.3d at 67–68.

V

Because the District offered Michael a FAPE, he cannot seek tuition reimbursement for his private education.  *See C.H.*, 606 F.3d at 71.  Even if the District denied Michael a FAPE in both instances, and assuming for argument purposes that Benchmark's program was appropriate, equitable considerations support denial of his reimbursement request.  "Even where a District is found to be in violation of the IDEA and private school placement is deemed appropriate, 'courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant.'"  *C.H.*, 606 F.3d at 71 (quoting *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246–247 (2009)).

Michael's parents unilaterally rejected the placement proposed by the school and never objected to the proposed IEP or told the District they would enroll Michael in a private school at public expense.  20 U.S.C. § 1412(a)(10)(C)(iii)(I); *see T.A.*, 557 U.S. at 247.  Their failure to request reevaluation in October of 2020 or notify the District of their concerns was unreasonable because, to that point, the District did not know Michael's parents were dissatisfied with the 2019 IEP and evaluation.  *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III).  These decisions warrant denying reimbursement under the statute.  *See T.A.*, 557 U.S. at 247.  That Michael's parents "cooperated with the District's reevaluation and participated in any meeting to which they were invited" is insufficient to overcome their failure to notify the District of their intent or their dissatisfaction with the IEP.  (Pl. Mot. Judgment 24–25.)

The Court affirms the Hearing Officer's finding that the District offered Michael a FAPE under the IDEA and Section 504, and that his parents failed to carry their burden of proof on the claim for tuition reimbursement for their unilateral private placement for the 2019–2020, 2020–2021 and 2021–2022 school years.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.